# In the United States Court of Federal Claims
### OFFICE OF SPECIAL MASTERS
No. 18-181V
**Filed: October 5, 2022**
PUBLISHED

| | |
|---|---|
| ERIN CODY,<br><br>                Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>                Respondent. | Special Master Horner<br><br>Shoulder Injury Related to Vaccine Administration ("SIRVA"); Influenza ("Flu") Vaccine; Table Injury; Ruling on the Record |

*Michael Patrick Milmoe*, Law Offices of Leah V. Durant, PLLC, Washington, DC, for petitioner.
*Nancy Tinch*, U.S. Department of Justice, Washington, DC, for respondent.

## RULING ON ENTITLEMENT[1]

On February 6, 2018, petitioner, Erin Cody, filed a petition under the National Childhood Vaccine Injury Act, 42 U.S.C. § 300aa-10-34 (2012),[2] alleging that her receipt of an influenza vaccination on December 31, 2016, caused a right shoulder injury. (ECF No. 1.) For the reasons set forth below, I conclude that petitioner is entitled to an award of compensation.

### I.    Applicable Statutory Scheme

Under the National Vaccine Injury Compensation Program, compensation awards are made to individuals who have suffered injuries after receiving vaccines. In general, to gain an award, a petitioner must make a number of factual demonstrations,

---

[1] Because this ruling contains a reasoned explanation for the special master's action in this case, it will be posted on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. *See* 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the ruling will be available to anyone with access to the Internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information the disclosure of which would constitute an unwarranted invasion of privacy. If the special master, upon review, agrees that the identified material fits within this definition, it will be redacted from public access.

[2] All references to "§ 300aa" below refer to the relevant section of the Vaccine Act at 42 U.S.C. § 300aa-10-34.

1

including showing that an individual received a vaccination covered by the statute; received it in the United States; suffered a serious, long-standing injury; and has received no previous award or settlement on account of the injury.  Finally – and the key question in most cases under the Program – the petitioner must also establish a causal link between the vaccination and the injury.  In some cases, the petitioner may simply demonstrate the occurrence of what has been called a "Table Injury."  That is, it may be shown that the vaccine recipient suffered an injury of the type enumerated in the "Vaccine Injury Table," corresponding to the vaccination in question, within an applicable time period following the vaccination also specified in the Table.  If so, the Table Injury is presumed to have been caused by the vaccination, and the petitioner is automatically entitled to compensation, unless it is affirmatively shown that the injury was caused by some factor other than the vaccination.  § 300aa-13(a)(1)(A); § 300 aa-11(c)(1)(C)(i); § 300aa-14(a); § 300aa-13(a)(1)(B).

As relevant here, the Vaccine Injury Table lists a Shoulder Injury Related to Vaccine Administration or "SIRVA" as a compensable injury if it occurs within 48 hours of administration of an influenza vaccine.  § 300aa-14(a) as amended by 42 C.F.R. § 100.3.  Table Injury cases are guided by statutory "Qualifications and aids in interpretation" ("QAIs"), which provide more detailed explanation of what should be considered when determining whether a petitioner has actually suffered an injury listed on the Vaccine Injury Table.  42 C.F.R. § 100.3(c).  To be considered a "Table SIRVA," petitioner must show that his injury fits within the following description:

> SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm.  These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction.  SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.).  SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis . . . .  A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time-frame;
>
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

> (iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. §100.3(c)(10).

Vaccine Program petitioners must establish their claim by a "preponderance of the evidence". § 300aa-13(a). That is, a petitioner must present evidence sufficient to show "that the existence of a fact is more probable than its nonexistence . . . ." *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010). Petitioner may not receive a Vaccine Program award based solely on her assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician. § 300aa-13(a)(1).

## II.   Procedural History

This case was originally assigned to the Special Processing Unit ("SPU"). (ECF No. 6.) Petitioner filed a Statement of Completion on April 2, 2018. (ECF No. 11.) On October 24, 2018, respondent indicated an interest in discussing settlement. (ECF No. 21.) However, the parties were unable to resolve the case after extended discussions, prompting respondent to file his Rule 4 report on March 20, 2020, and the case to subsequently be reassigned Special Master Roth on July 15, 2020. (ECF Nos. 49, 54.)

When respondent filed his Rule 4 report, he contended that petitioner could not demonstrate a Table SIRVA for two reasons. First, he indicated that there is not preponderant evidence of onset of shoulder pain occurring within 48 hours of vaccination. (ECF No. 49, p. 8.) Second, he contended that petitioner's pain and reduced range of motion were not limited to the shoulder in which she received her vaccination. (*Id*. at 9.)

While the case was pending before Special Master Roth, petitioner filed a letter by one of her treating physicians, Catherine Troy, as well as several witness declarations, and an expert report by orthopedist Uma Srikumaran, M.D. (ECF Nos. 51, 57.) The case was subsequently reassigned to me on January 29, 2021. (ECF No. 65.) At the time the case was reassigned, respondent had a pending deadline for the filing of a responsive expert report. However, shortly after the reassignment, respondent filed a motion seeking to take the deposition of Dr. Troy, arguing that the letter she supplied to petitioner contradicted her contemporaneous medical records. (ECF No. 66.) Respondent requested his expert report deadline be suspended pending this discovery. (*Id*.)

I held a status conference on February 16, 2021. (ECF No. 67.) I granted respondent's motion in part and denied it in part, rejecting respondent's request for a deposition but allowing respondent to issue written interrogatories and seek a complete copy of petitioner's patient file with Dr. Troy. (*Id*.) I also denied respondent's request to stay his expert report deadline, explaining that the medical issue raised by respondent

3

(whether the pain and reduced range of motion were limited to the shoulder in question) was not dependent upon the discovery he sought, which pertained to onset only.  (*Id*.)

In lieu of filing an expert report, respondent filed an amended Rule 4 report on March 8, 2021.  (ECF No. 70 (docketed as a Status Report).)  In the amended report, respondent "agrees that petitioner's pain was limited to her vaccinated arm, but respondent does not agree that petitioner's symptoms began within the Table timeframe for SIRVA." (*Id*. at 2.)  On April 9, 2021, respondent filed Dr. Troy's interrogatory responses and patient file.  (ECF No. 71; Exs. A-B.)

Following this discovery, respondent renewed his request to depose Dr. Troy.  (ECF No. 72.)  I subsequently advised, however, that my preliminary view was that the case would not turn on Dr. Troy's testimony.  I instructed petitioner to file a motion for a ruling resolving entitlement on the written record and indicated that respondent could address his request to depose Dr. Troy in his response "thereby raising the question for resolution in the entitlement decision."  (ECF No. 74.)

Petitioner filed her motion for a ruling on the record on September 24, 2021.  (ECF No. 78.)  Respondent filed his response on November 10, 2021.  (ECF No. 80.)  Petitioner filed a reply on December 3, 2021.  (ECF No. 83.)  As briefed by the parties, the only issue to be resolved is the initial onset of petitioner's condition.  Respondent noted the fact that his prior request to depose Dr. Troy had been denied, but did not renew his request in his brief or include any argument as to why Dr. Troy's testimony is necessary to resolve entitlement.  (ECF No. 80, p. 6 n.3.)

I have determined that the parties have had a full and fair opportunity to present their cases and that it is appropriate to resolve this issue without a hearing.  *See* Vaccine Rule 8(d); Vaccine Rule 3(b)(2); *Kreizenbeck v. Sec'y of Health & Human Servs.*, 945 F.3d 1362, 1366 (Fed. Cir. 2020) (noting that "special masters must determine that the record is comprehensive and fully developed before ruling on the record.").  Accordingly, this matter is now ripe for resolution.

### III.     Factual History

#### a.  As reflected in the medical records

Petitioner had an extensive course of treatment for her alleged shoulder injury and most of the records generated in the course of that treatment do not specifically address the initial onset of the condition.  Accordingly, only select medical records directly bearing on the question of onset are discussed.  Most notably, that includes all of the encounter records generated during the months leading up to petitioner's initial report and treatment of her injury as well as subsequently generated records that include histories of onset elicited from petitioner.  Petitioner received the vaccination at issue in her right deltoid on December 31, 2016.  (Ex. 1, p. 1.)

4

i. <u>Treatment with primary care physician</u>

Three days after her vaccination, petitioner presented to Dr. Catherine Troy, her primary care physician, for an annual physical exam.  (Ex. 5, pp. 1-2.)  Petitioner reported a history of heart burn and a resolved cough as well as a stressful year due to her mother's passing.  (*Id*. at 1.)  Petitioner's past medical history included chronic lower back pain.  Musculoskeletal exam documented right leg and hip pain as well as lower back pain and the review of systems indicated "admits trauma to hip(s), low back and hip."  Specifically, petitioner reported falling on black ice two weeks prior.  (*Id*. at 1-2.)  Petitioner's assessment included lower back pain for which she was advised to follow up with Dr. Allen Troy, an orthopedic surgeon.  (*Id*.)  There is no reference to shoulder pain in this encounter record; however, the record does not confirm any upper extremity examination.

As discussed separately below, petitioner later consulted Dr. Allen Troy less than two months later on February 28, 2017, at which time she commenced treatment for her shoulder condition.  (Ex. 2, p. 4.)  In the interim, she called her primary care office on two occasions, on January 5, 2017, and on January 6, 2017.  The first call was with regard to lab work and whether petitioner needed a referral for her anticipated orthopedic follow up.  The second regarded an "excruciating" sinus headache.  (Ex. B, pp. 71, 73.)  Neither call mentioned right shoulder pain.  Petitioner did not return to her primary care office until the autumn.

On September 29, 2017, petitioner called Dr. Catherine Troy's office.  The message was "pt called she wants to talk to you re: a flu shot, and a bad reaction she got last year."  (Ex. B, p. 67.)  The record indicates a recommendation that future vaccines be administered in the buttock.  (*Id*.)  Subsequently, on November 15, 2017, she returned for her next year's flu vaccination.  At that time, she requested that it be administered in her gluteus because she "had [a] flu vaccine last year in arm which caused her multiple medical problems with shoulder from which she [is] still treating . . . ."  (*Id.* at 64.)  Dr. Catherine Troy added the fact of petitioner's post-vaccination shoulder pain to her musculoskeletal review of systems as of her 2018 annual exam on January 9, 2018.  (*Id.* at 57.)

On June 5, 2020, petitioner had a facetime appointment as a "f/u shoulder injury from injection."  (Ex. B, p. 12.)  During that encounter, petitioner provided a history of having a SIRVA following her December 31, 2016 flu vaccination.  Dr. Troy records that "She had a [complete physical exam] on 1/3/2017 [office visit] and remember[s] she [complained of] pain in [the] arm from Flu vaccine . . . . I did see her on [J]anuary 3rd and told [her] to put ice on it and give the [S]hingrix in the other arm."  (*Id.*)  Under separate notes heading, Dr. Troy recorded that "[I] clearly remember [patient] bringing me [the article of] shoulder injury from injections as a good friend of mine and my [patient] had a similar occurrence and I had [recommended] gluteal flu shot ever since – [unfortunately] my documentation [was poor, but patient actually] brought me an article on [the] injury [which] I do [remember] reading.  [I will] write a letter to support her."  (*Id.*)

5

## ii. Treatment of shoulder condition

Petitioner presented to Dr. Allen Troy on February 28, 2017, approximately two months following the vaccination at issue.  At that time, she did not discuss the lower back pain raised at her prior January 3 primary care encounter, but instead raised a new injury of right shoulder pain.  (Ex. 2, pp. 4-5.)  Dr. Troy recorded that onset was six weeks prior, which would be approximately mid-January, but also recorded that petitioner associated the pain to her flu shot.  (*Id*. at 5.)  Dr. Troy prescribed Nabumetone (an NSAID) and offered a physical therapy referral if symptoms did not improve.  (*Id*.)

Petitioner presented for a physical therapy evaluation about six weeks later on April 11, 2017.  (Ex. 3, p. 48.)  At that time, petitioner reported "R shoulder, progressively worse.  Started right after flu shot, New Years Eve."  The date of onset is listed as "12/31/2016" and the mechanism of injury is listed as "flu shot."  (*Id*.)

Petitioner continued to treat her shoulder condition throughout the remainder of 2017 and 2018, but the resulting records are largely uninformative regarding the initial onset of her condition.  In July of 2017, petitioner switched to a different physical therapist.  (Ex. 4, p. 17.)  At that time, the mechanism of injury was noted to be an incorrectly administered flu vaccine, but a specific date of onset was not recorded.  The vaccination was noted to have been "several months ago."  (*Id*.)  On November 30, 2017, petitioner underwent another physical therapy evaluation.  (Ex. 8, p. 37.)  The history of present illness indicated "R shoulder adhesive cap from Dec 2016, after flu shot."  (*Id*.)

Eventually, petitioner underwent arthroscopic surgery on April 11, 2019.  (Ex. 14, pp. 5-6.)  By that time, the course of petitioner's condition was described only broadly as "prolonged."  (*Id*. at 5.)  However, petitioner would later indicate to her orthopedic surgeon during a May 16, 2019, follow up visit that she is "concerned that this is due to her flu shot from last year when the sx initially were there."  (*Id*. at 10.)  Petitioner continued to seek treatment thereafter, but the remaining records are not helpful in resolving onset.

### b. As reflected in additional evidence

#### i. Petitioner's affidavit

According to petitioner's affidavit dated March 27, 2018, she recalls getting her flu vaccination on December 31, 2016, while shopping at Stop and Shop.  (Ex. 10, p. 1.)  She recalls the store made an announcement reminding people to get their flu shot and so she decided to go ahead and get hers.  She recalls the pharmacist thanking her for helping him make his end of year quota.  (*Id*.)  She indicates that the injection "hurt more than usual but I didn't think anything of it."  (*Id*.)  However, by that evening she commented to her brother that her arm was hurting from the shot.  Petitioner indicates

6

she continued to feel pain for the next several days, but suggests she has a high tolerance for pain which caused her to "brush[] it off." (*Id*.)

Petitioner avers that she mentioned her shoulder pain to her doctor at her subsequent annual exam, but indicates that she did so "in an offhanded way" and that her doctor recommended icing it. (*Id*.) Petitioner indicates that the shingles vaccine she received at this encounter was administered in her left arm because she requested a left-arm administration due to her right shoulder pain. (*Id*. at 1-2.) In contrast, she indicates she expressed no shoulder preference when she received her flu vaccine. (*Id*. at 1.)

Petitioner indicates that she continued to ice her shoulder for several weeks, not becoming concerned until about the third or fourth week. She recalls her pain worsened while she was staying at her timeshare in Florida, and she called the orthopedist when she returned from that trip. (*Id*. at 2.)

### ii. Additional witness declarations

Petitioner has filed fourteen witness declarations as follows:

- Ann Lepore, a friend of 20 years, recalls petitioner telling her in early January of 2017 that she received her flu shot and that her shoulder was extremely painful. (Ex. 19.) She recalls that petitioner indicated she reported it to her physician at her annual exam and the doctor said to ice it. She suggests this was noteworthy because petitioner rarely complains of being sick or in pain. (*Id*.)

- Beth Ann Cody, petitioner's sister, recalls that petitioner complained on New Year's Eve that her shoulder still hurt from her flu shot, that it still hurt on New Year's Day, and that they had to cancel plans for that long holiday weekend because of the shoulder pain. (Ex. 20.) Ms. Cody indicates that she lives with petitioner during the winter months and so she was able to observe petitioner's pain in the days and months following the vaccination. (*Id*.)

- Bridget Kopek, a longstanding acquaintance, recalls having dinner with petitioner in mid-January 2017. (Ex. 21.) She recalls petitioner experiencing pain when reaching for an object on the table, prompting a conversation about how petitioner's flu vaccine on New Year's Eve had been causing her pain. (*Id*.)

- Daniel Doty, a friend, spoke to petitioner on the phone in early January of 2017 and recalls being told petitioner was experiencing persistent pain since her flu shot. (Ex. 22.)

- Debbie McCarthy, a friend, recalls being told of petitioner's post-vaccination shoulder pain when petitioner stopped by her house for a holiday visit in early January 2017. (Ex. 23.)

- Jack Woodley, a neighbor since 2010, also recalls being told during a post-holiday visit in January 2017 that petitioner was experiencing post-vaccination shoulder pain. (Ex. 24.)

- John Cody, petitioner's brother, recalls noticing petitioner's shoulder pain as of New Year's Day when he noticed she didn't seem to be having a good time and she explained that her arm was hurting. (Ex. 25.)

- John Nishimoto, a cousin by marriage, recalls that during a visit for an unspecified holiday in early 2017 petitioner told him she was experiencing shoulder pain that started the day after her flu vaccination. (Ex. 26.)

- Matt O'Sullivan, a colleague at Hibernian Hall, recalls learning of petitioner's shoulder pain during a phone call in early January 2017 as well as again during an in-person meeting about a week later. (Ex. 27.)

- Nanda Scott, a cousin by marriage, recalls a phone call with petitioner that occurred in February of 2017 after she had already been to the orthopedist. (Ex. 28.) However, petitioner related her shoulder pain to her flu shot occurring in December of 2016. (*Id.*)

- Patricia Macki, a neighbor, recalls a conversation occurring in early January of 2017 during which petitioner indicated her arm had been in pain since getting a flu shot on New Year's Eve 2016. (Ex. 29.)

- Susan Saracena, a friend, recalls that during a conversation around the time of her birthday in late January 2017 petitioner explained that shoulder pain following her flu vaccination had "put a damper" on her New Year's Day and had been bothering her ever since. (Ex. 30.)

- Terese Smith, a friend, recalls a post-holiday phone conversation in early January 2017 and multiple phone conversations later in January of 2017 during which petitioner discussed her shoulder pain following her flu shot. (Ex. 31.)

- Terie Rixman, an acquaintance from Hull, Massachusetts, recalls being told in January of 2017 of petitioner's post vaccination pain. (Ex. 32.)

### iii. Dr. Catherine Troy's letter and interrogatory responses

Petitioner also filed a "to whom it may concern" letter by her primary care physician, Dr. Catherine Troy, dated June 5, 2020. (Ex. 18.) In the letter, Dr. Troy represents that she recalls petitioner complaining of shoulder pain following her flu vaccination during the physical of January 3, 2017. (*Id.*) Dr. Troy recalls telling petitioner to ice her arm and also indicates that she administered petitioner's shingles

8

vaccine in the opposite arm.³ (*Id*.)  Dr. Troy does not specify which shoulder was discussed during the January 3 encounter, but misstates that petitioner subsequently underwent surgery on her left shoulder.  (*Id*.)  She indicates that she recommended future vaccines be administered in the buttock.  (*Id*.)

      Dr. Troy subsequently responded to respondent's interrogatories on March 12, 2021.  (Ex. A.)  Respondent posed four questions.  First, Dr. Troy confirmed she is the author of the June 5, 2020 letter.  Second, asked whether the letter was based on personal recollection, she responded that it was "based on her symptoms and history."  Third, asked to describe in detail the information she reviewed when writing the letter, she indicated she reviewed a note from January 9, 2018, the immunization log showing her recommendation for future vaccines to be administered in the buttock, and a pre-op note from March 28, 2019.  (All of these documents were attached to the interrogatory response.)  Fourth, asked to confirm under penalty of perjury that the letter was written solely by her and reflects her independent recollection, Dr. Troy responded "yes."  (*Id*.)

### IV.     Party Positions

      In her motion, petitioner contends that she suffered a right-side shoulder injury meeting all four elements demonstrating a SIRVA Table injury and is therefore entitled to compensation.  (ECF No. 78, p. 8.)  Given the posture of the case, petitioner's brief focuses on the second element, i.e., whether her shoulder pain began within 48 hours of vaccination.  (*Id*. at 9.)  Respondent disputes that petitioner has offered preponderant evidence that her shoulder pain began during that timeframe.  Accordingly, respondent suggests petitioner has not demonstrated a Table SIRVA and her claim should be dismissed.  (ECF No. 80, p. 7.)  Respondent does not raise any argument as to any other aspect of petitioner's Table SIRVA claim or assert that a factor unrelated to vaccination caused petitioner's condition.

      Addressing the fact that petitioner's January 3, 2017 encounter record with Dr. Catherine Troy does not reflect that she discussed her shoulder pain with Dr. Troy at that time, petitioner stresses two points.  First, other evidence of record indicates otherwise.  (ECF No. 78, p. 9.)  Second, the Federal Circuit has rejected the notion that there is a presumption that medical records are complete as to all of a patient's conditions. (*Id.* (citing *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021)).)  Petitioner notes that it is not unusual for SIRVA petitioners to delay treatment thinking that their symptoms will be transitory.  (*Id*. at 10 (quoting *Wyffels v. Sec'y of Health & Human Servs.*, No. 18-1874V, 2021 WL 798834 (Fed. Cl. Spec. Mstr. Jan. 26, 2021)).)

---

³ Specifically, the letter states: "I did see her on January 3ʳᵈ, advised her to put ice on [the] shoulder and also gave her a Shingrix Vaccine in the other arm." (Ex. 18.)  It is not clear whether Dr. Troy meant to suggest that she herself had administered this vaccine; however, both the medical record and petitioner's affidavit confirm that the vaccine was administered by a nurse.  (Ex. 5, p. 2; Ex. 10, p. 1.)

Petitioner further explains that the Vaccine Act explicitly permits a special master to find that a first symptom or manifestation of a Table injury began within the prescribed period "even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." (*Id.* at 11 (quoting 42 U.S.C. § 300aa-13(b)(2)).) In that regard, petitioner stresses that her subsequent medical records are consistent in placing onset of her condition in the context of her December 31, 2016 flu vaccination. (*Id.*) She also points to the additional letter by Dr. Catherine Troy as well as her fourteen supporting witness declarations. (*Id.* at 11-12.)

Petitioner argues that Dr. Allen Troy's reference to onset occurring six weeks prior to February 28, 2017 is "nebulous" and uncorroborated by any other evidence of record. (*Id.* at 12.) Petitioner also emphasizes that the same notation associated onset with petitioner's flu shot. (*Id.* (quoting Ex. 2, p. 5).)

In contrast, respondent stresses that petitioner's first post-vaccination primary care encounter of January 3, 2017, and her first treatment for her shoulder condition on February 28, 2017, are both consistent in failing to place onset of petitioner's condition within 48 hours of her vaccination. That is, petitioner failed to report any shoulder symptoms on January 3, three days post-vaccination, then reported an onset falling in mid-January of 2017 when she later reported for orthopedic care. (ECF No. 80, p. 4 (discussing Ex. 3, pp. 112-13 and Ex. 2, pp. 4-6).) Respondent also notes that the January 3, 2017 record contains no objective findings that could confirm the presence of shoulder pain at that time. (*Id.* at 6.) Respondent notes that contemporaneous medical records generally warrant consideration as trustworthy evidence. (*Id.* at 1 (quoting *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993)).) Therefore, respondent contends that these initial treatment records should be given significant weight. (*Id.* at 5.)

Respondent urges that Dr. Catherine Troy's subsequent letter should be given little weight. (*Id.* at 5.) In particular, respondent notes that her subsequent letter was written three years after the fact, misidentifies the shoulder at issue, and was informed by much later records dating from 2019. (*Id.*) Respondent therefore argues her recollection should be rejected as not reflecting an independent recollection of events. (*Id.* at 6.) Respondent also contends that petitioner's witness declarations should also be given less weight, because they are recollections presented years later and by individuals who are not necessarily disinterested. (*Id.* at 6-7 (quoting *Reusser v. Sec'y of Health & Human Servs.*, 28 Fed. Cl. 516, 523 (1993) and *Lett v. Sec'y of Health & Human Servs.*, 39 Fed. Cl. 259, 260 (1997)).)

### V.     Discussion

As explained above, the Vaccine Injury Table lists SIRVA as a compensable injury if it occurs within 48 hours of administration of a vaccine containing the influenza virus. § 300aa-14(a) as amended by 42 C.F.R. § 100.3(a). To be considered a Table

10

"SIRVA," petitioner must show: (i) there is "no history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection"; (ii) that "onset of pain occurred within the specified timeframe," i.e. within 48 hours; (iii) that "pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered"; and (iv) that "no other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy)." 42 C.F.R. § 100.3(a); 42 C.F.R. § 100.3(c)(10).

In this case, only the question of onset is disputed. Moreover, my own review of the record confirms that the other SIRVA QAI criteria are preponderantly satisfied. Accordingly, if there is preponderant evidence that petitioner's shoulder pain began within 48 hours of vaccination, then she is entitled to compensation for a Table SIRVA. For the reasons discussed below, I conclude when considering the record as a whole that petitioner's shoulder pain did more likely than not begin within 48 hours of vaccination and petitioner is entitled to compensation.

The process for making determinations in Vaccine Program cases regarding factual issues begins with consideration of the medical records. § 11(c)(2). The special master is required to consider "all [ ] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as "the results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions." § 13(b)(1)(A). The special master is then required to weigh the evidence presented, including contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993). Pursuant to Vaccine Act § 13(a)(1)(A), a petitioner must prove their claim by a preponderance of the evidence. A special master must consider the record as a whole, but is not bound by any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. § 13(b)(1). As petitioner observes in her motion, a special master may find that onset of a Table injury occurred within the specified timeframe "even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period" so long as the finding is preponderantly supported. 42 U.S.C. § 300aa-13(b)(2)).

Here, when considering petitioner's actual *treatment* records as a whole, they preponderate in favor of an immediate post-vaccination onset. Respondent is correct that Dr. Allen Troy's initial encounter record includes a notation that would place onset in mid-January if given precedence; however, petitioner is also correct to note that the same record specifically associates the injury to vaccination. When petitioner

subsequently presented for her first physical therapy evaluation on April 11, 2017, the record much more clearly places onset by indicating "Started right after flu shot, New Years Eve." The date of onset is further specified as "12/31/2016" and the mechanism of injury is listed as "flu shot." (Ex. 3, p. 48.) Respondent limits his discussion of this record to a footnote and asserts incredibly that it lacks specificity. (ECF No. 80, p. 3 n.2.) Several subsequent records by different providers further repeat the same basic history with varying detail. (Ex. 4, p. 17; Ex. 8, p. 37; Ex. 14, p. 10.) Given the specificity of the April 11, 2017, physical therapy evaluation, the other less specific notations can easily be read as being in harmony, including that aspect of Dr. Allen Troy's notation that associates the shoulder pain to the vaccination, albeit while otherwise incongruently identifying the duration of the injury.

This conclusion is further bolstered by petitioner's affidavit and numerous fact witness declarations. While the fact witness declarations do not merit the same weight as the contemporaneous medical records, they are entitled to some weight and are both numerous and remarkably consistent as far as they go in terms of detail. Moreover, they are consistent with the medical records when the medical records are considered as a whole. All but a few of the statements confirm the presence of ongoing shoulder pain based on interactions with petitioner occurring in January of 2017. Several also include added detail associating petitioner's pain to a vaccination received on New Year's Eve.

Respondent is correct to note that petitioner's January 3, 2017 encounter record does not reflect any complaint of shoulder pain just three days post-vaccination. Importantly, however, this record is merely silent as to the existence of any pain rather than directly negating the presence of any shoulder pain. "[T]he absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance." *Murphy v. Sec'y of Health & Human Servs.*, 23 Cl. Ct. 726, 733 (1991) (quoting the decision below), *aff'd per curiam*, 968 F.2d 1226 (Fed. Cir. 1992). Here, the record reflects that petitioner was experiencing back and hip pain caused by a recent fall. (Ex. 5, p. 2.) Unsurprisingly then, a musculoskeletal exam demonstrated symptoms relative to the lower back, hip, and legs; however, it does not confirm that any upper extremity exam was completed. *Accord Kirby*, 997 F.3d at 1384 (rejecting any presumption that medical records are complete and further rejecting the government's contention that notation of a partial neurologic exam is evidence that no other reproducible symptoms were present). Although petitioner suggests that she did report shoulder pain at this visit, she admits that it was only presented in an "offhanded" manner as she had not yet concluded that her pain would not go away. (Ex. 10, p. 1.) As petitioner notes in her motion, this type of thinking is not necessarily unusual among SIRVA patients. *See, e.g., Lang v. Sec'y of Health & Human Servs.*, No. 17-995V, 2020 WL 7873272, at *11 (Fed. Cl. Spec. Mstr. Dec. 11, 2020) (noting that "there is no such thing as an 'appropriate' time to seek treatment"); *Smallwood v. Sec'y of Health & Human Servs.*, No. 18-291V, 2020 WL 2954958, at *10 (noting that is it "common for a SIRVA petitioner to delay[] treatment,

12

thinking his/her injury will resolve on its own"). In that regard it is significant that this encounter was, in fact, *very* soon after the vaccination at issue.

Considering all of the circumstances and other evidence of record, the fact that the January 3, 2017 encounter record is silent is not strong evidence that shoulder pain was absent. Thus, even without considering Dr. Troy's subsequent statements, it does not outweigh the collective weight due the contemporaneous treatment records and, to a lesser extent, the witness statements, all of which are otherwise in accord. For this reason, I do not find it necessary to determine whether Dr. Troy's subsequently furnished letter is reliable.

### VI. Conclusion

For all the reasons discussed above, after weighing the evidence of record as a whole, I find by preponderant evidence that petitioner suffered a Table Injury of SIRVA following her December 31, 2016 influenza vaccination as alleged. She is therefore entitled to compensation. Because I have found the presence of a Table Injury in this case, it is not necessary to address whether petitioner has presented a cause-in-fact claim. A separate damages order will be issued.

**IT IS SO ORDERED.**

<u>s/Daniel T. Horner</u>
Daniel T. Horner
Special Master